NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0536n.06
Filed: July 31, 2007
Case No. 05-6626

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KENNETH AUSTION, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| CITY OF CLARKSVILLE, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: MERRITT and BATCHELDER, Circuit Judges; HEYBURN[*], District Judge.

ALICE M. BATCHELDER, Circuit Judge. Defendant City of Clarksville ("Clarksville")

appeals the district court's judgment awarding damages to Plaintiff Kenneth Austion ("Austion")

for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*,

and the Tennessee Human Rights Act ("THRA"), Tenn. Code. Ann. § 4-21-101 *et seq.* On appeal

Clarksville challenges the timeliness of Austion's claims, certain evidentiary decisions of the district

court, the district court's denial of its renewed motion for judgment as a matter of law, and the

district court's denial of its motion for a new trial and motion for remittitur. Because some of

Austion's claims were untimely, we **REVERSE** the district court's judgment as to these claims, but

because Clarksville's other contentions are without merit, we **AFFIRM** the remainder of the district

---

[*]The Honorable John G. Heyburn II, United States Chief District Judge for the Western District of Kentucky, sitting by designation.

court's judgment.

## I. Background

**A.    Factual Background**

In 1991, Austion, who is African-American, began working for the Clarksville Police Department ("CPD"); he quickly was selected as an officer for the Vice/Narcotics Unit. Shortly after Austion began his employment, another CPD officer displayed racist cartoons on the briefing table in the police station. While Austion did not personally view the cartoons, he was aware that they were displayed in the station. A few years later, in 1996, he became the K-9 handler for the Vice Unit. He held that position for two years until 1998 when he was demoted to patrolman because of performance deficiencies, including problems completing the K-9 paperwork.

In 2001, an unidentified officer hung a noose in a workstation at police headquarters. The noose was displayed for at least four months until African-American Detective Tony Blakely contacted the National Association for the Advancement of Colored People ("NAACP"), and the NAACP contacted the CPD about removing the noose. While Austion was not intimately involved in this situation, he was made aware of the events from the other African-American officers in the CPD.

In September 2001, Austion sought promotion to the position of sergeant. The promotion policy stated that the "Chief of Police shall make the selection from eligible candidates that have a total combined score of 70 or better [on the written test]," but Police Chief Mark Smith ("Chief Smith") testified that he "could go outside the policy" in making promotion decisions. Austion scored higher than 70 on the written test, but Chief Smith denied his promotion because of his lethargic work ethic, lack of self motivation, low production, and deficient paperwork. Instead of

2

Austion, Chief Smith promoted eight officers to the rank of sergeant — including five Caucasian males, two African-American males, and one African-American female.

In March 2002, Austion was promoted from patrolman to detective. Still aspiring to become a sergeant, he again applied for a promotion when a sergeant position became available in May 2002. This time Chief Smith chose a Caucasian officer, John Crabbe, for the sergeant position. On August 28, 2002, Austion filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that the CPD had denied him a promotion on the basis of race in May 2002. The EEOC issued a right to sue letter on September 6, 2002.

In January 2003, Sergeant Daryl Brewer, Austion's direct supervisor, requested that Austion receive a written commendation for his work in apprehending a criminal outside of his jurisdiction. The commendation was not processed, and Sergeant Brewer inquired "about 20 times" as to its status. Captain Charles Brooks eventually told Brewer that Austion's commendation was delayed because Austion "was going through some things right now." Sergeant Brewer interpreted Brooks's comment to imply that the commendation was delayed because of Austion's EEOC charge.

Moreover, Captain Brooks, an African-American officer, circulated a letter defending Chief Smith against allegations that he was unfairly treating minority employees. The letter referred to those employees who had filed discrimination charges as "complainers" and "disgruntled employees." Several African-American officers, including Austion, Officer Vince Lewis, Detective Martin Hall, and Detective Tony Blakely — all of whom had filed EEOC complaints against the CPD — complained to Human Resources Director Michael Worsham about this letter. Worsham asked Chief Smith to stop its distribution, but Chief Smith refused because, in his opinion, the CPD employees had a right to express their support for him.

3

In May 2003, because of the EEOC complaints, Chief Smith asked certain officers to remove potentially offensive items from the workplace. Austion had two figurines on his desk — a muscular Caucasian policeman with a dog, and a tribesman on a motorcycle. Chief Smith told Austion to remove the tribesman because he thought it would offend minorities, but he did not comment on the policeman figurine.

A few days later, Austion approached Chief Smith regarding rumors of an investigation that Austion was involved in drugs and prostitution. Even though Austion initiated the meeting, Chief Smith told him that he was not allowed to talk unless he was given permission. Then Chief Smith, accompanied by his entire command staff, went on to state:

> It stops here. You have made allegations . . . . You have made allegations against me and throughout the rest of this command staff. That is disloyalty to the aims and ideas of this police department. That is disrupting the good order of this police department. Mr. Austion I do not care if you go to the EEOC. I do not care if you sue. I am not afraid nor is any man in this room afraid to lay all of the truth out on the table. We're going to. And if we're doing something wrong, I expect to be corrected . . . .
>
> . . . You may go to the District Attorney. You may go to the Mayor. You may go to any councilmember that you want. I don't care. Not while you're on duty. You will, not — and that is an order.[1]

Following Chief Smith's spirited rant, he ordered Austion to leave despite Austion's repeated efforts to respond to Chief Smith's comments. Approximately one month later, on June 18, 2003, Austion filed another charge with the EEOC alleging that Chief Smith "yelled" at him in retaliation for filing his previous EEOC charges. The EEOC issued a right to sue letter on June 23, 2003.

In October 2003, the CPD changed Austion's on-call schedule from 2:00 p.m. to 10:00 p.m.

---

[1]Austion would often keep a tape recorder hidden in his pocket during conversations with Chief Smith and other CPD supervisors; therefore Austion was able to provide the court with a tape and transcript of this meeting.

— consisting of mostly daytime hours — to 7:00 p.m. to 3:00 a.m. — requiring Austion to remain on call throughout the evening into the early hours of morning. This schedule change was difficult on Austion because he was still required to work his regular shift from 8:00 a.m. to 4:00 p.m., while remaining on call until 3:00 a.m.

In September 2004, a drive-by shooting occurred at a house owned by Officer Travis Hisel, but in which he resided only sporadically. Officer Hisel, a Caucasian officer who befriended many of his African-American co-workers, thought other Caucasian CPD officers might have perpetrated the shooting as a means of retaliating against him for defending black officers and filing discrimination charges. Because of his suspicions, Officer Hisel told Chief Smith that he was uncomfortable with the CPD investigating the shooting, and as a result, the entire investigation — including the CPD's file and Chief Smith's handwritten notes — was turned over to the Tennessee Bureau of Investigation ("TBI").[2] The CPD and the TBI suspected that the shots might have been fired by Austion or other African-American officers to support their hostile work environment claims against the CPD, and the CPD ordered Austion to relinquish his weapon for testing to determine his involvement in the shooting.

At trial, Austion introduced testimony that supervisory officers used racial slurs throughout the department. For example, in the late 1980s, Chief Smith used the word "nigger" to describe African-Americans in the CPD. More recently, in 2003, a Caucasian officer referred to Detective

---

[2]In its brief, Clarksville mentions, without developing an argument or providing any legal support, that the district court erred by requiring Clarksville to provide Austion with the documents that CPD gave to the TBI — documents which Clarksville characterizes as "attorney work product." We need not address this claim because it was raised in a perfunctory and inadequate manner. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Moreover, Clarksville does not provide the court with copies of the alleged "attorney work product" and cites absolutely no legal support for its argument.

5

Blakely as a "nigger," and a supervisory officer called Detective Hall a "nigger" after he arrived late at the shooting range.

The CPD eventually became concerned with and attempted to neutralize any racial hostility in its workplace. The CPD hired a group of outside consultants from Municipal Technical Advisory Service to assess diversity issues within the department. The consultants evaluated approximately 60% of the department and determined that racial issues were not a problem. Later, at the CPD's request, the EEOC sent a team to investigate discrimination complaints, and the EEOC issued no-cause findings for each complaint.

## B.    Procedural Background

On September 15, 2003, Austion filed suit against the City of Clarksville[3] alleging that Clarksville violated the Civil Rights Act of 1991, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act, Tenn. Code. Ann. § 4-21-101 *et seq*, by (1) demoting him on the basis of race in 1998, (2) denying his promotion on the basis of race in 2001 and 2002; (3) creating a hostile work environment on the basis of race; and (4) retaliating against him for filing EEOC charges.[4] Clarksville filed a motion for summary judgment arguing, among other things, that many of Austion's claims were not timely filed. The district court denied Clarksville's motion and the claims proceeded to trial.

The jury found Clarksville liable for (1) demoting Austion in 1998, (2) failing to promote

---

[3]Austion's complaint included former Police Chief Lavoyed Hudgins as a defendant. Early in the proceedings, Hudgins moved for summary judgment, and Austion conceded that he should be dismissed. Therefore his role in this suit is irrelevant for purposes of this appeal.

[4]Austion also alleged that Clarksville discriminated against him on the basis of his race by failing to promote him to the SWAT unit from 1993 through 1998; however, the jury denied this claim, and Austion chose not to appeal it. Therefore we are not concerned with this claim for purposes of this appeal.

Austion in 2001 and 2002, (3) creating a hostile work environment on the basis of race, and (4) retaliating against Austion for protected activity. The district court entered judgment awarding compensatory damages of $300,000, as dictated by the jury verdict; back pay of $1,287.84; and front pay of $19,642.00. Clarksville filed a renewed motion for a judgment as a matter of law, a motion for a new trial, and a motion for remittitur. The district court denied Clarksville's post-trial motions, and Clarksville filed a timely notice of appeal.

## II. Analysis

On appeal Clarksville challenges (1) the timeliness of Austion's claims, (2) numerous evidentiary decisions of the district court, (3) the district court's denial of Clarksville's renewed motion for judgment as a matter of law, and (4) the district court's denial of Clarksville's motion for a new trial and motion for remittitur. We will address these arguments in turn.

### A.      Timeliness of Austion's Claims

#### 1.      1998 Demotion Claim

Austion asserted his 1998 demotion claim under both Title VII and the THRA. A plaintiff must comply with specific administrative requirements in order to file a lawsuit under Title VII. *See* 42 U.S.C. § 2000e-5. The first requirement is that a plaintiff must file a discrimination charge with a state or local agency within 300 days after the occurrence of the "alleged unlawful employment action." 42 U.S.C. § 2000e-5(e)(1). Austion's EEOC complaint alleging that his 1998 demotion was discriminatory was not filed until August 2002, well after the 300-day time limit.

Nevertheless this 300-day time period for filing a charge with the EEOC may be subject to equitable tolling. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The continuing-violations theory is a specific equitable doctrine that tolls this filing period. *Kovacevich v. Kent State*

7

*Univ.*, 224 F.3d 806, 829 (6th Cir. 2000). The Supreme Court's decision in *Morgan* largely curtailed the continuing-violations theory when applied to "discrete discriminatory acts," *see Morgan*, 536 U.S. at 114 (rejecting the "serial violations" version of the continuing-violations theory), but we have recognized that the continuing-violations theory still applies to discrete discriminatory acts that are part of a "longstanding and demonstrable policy of discrimination," *see Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003) ("The second category of continuing violations, involving a longstanding and demonstrable policy of discrimination, is not implicated by *Morgan*."). The district court held as a matter of law that Austion "provided substantial testimonial, statistical, and documentary evidence tending to show that [Clarksville] engaged in a longstanding and demonstrable policy of discrimination," and therefore found that Austion's 1998 demotion claim was saved by the continuing-violations theory. We disagree and find that the 1998 demotion claim was not timely filed with the EEOC.

To establish a longstanding and demonstrable policy of discrimination, a plaintiff "must demonstrate something more than the existence of discriminatory treatment in his case." *Haithcock v. Frank*, 958 F.2d 671, 679 (6th Cir. 1992). A plaintiff must establish that the employer's "standing operating procedure" included intentional discrimination against the class of which plaintiff was a member. *Sharpe*, 319 F.3d at 269 (quoting *EEOC v. Penton Indus. Publ'g Co.*, 851 F.2d 835, 838 (6th Cir. 1988)). "Unrelated incidents of discrimination will not suffice to invoke this exception; rather there must be a continuing over-arching policy of discrimination." *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1106 (6th Cir. 1995). Generally this exception is strictly construed and is satisfied only where the defendant has a known policy or rule supporting discrimination. *See, e.g., Dixon v. Anderson*, 928 F.2d 212, 217 (6th Cir. 1991) (finding an "over-arching policy" of

8

discrimination where that policy appeared plainly in the Ohio Revised Code and administrators openly adhered to the Code); *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 408-09 (6th Cir. 1999) (finding a "longstanding and demonstrable policy" where the union's "working-in-the-calling" rule, which was memorialized in its constitution and bylaws, resulted in the "de facto exclusion" of African Americans from union membership). *But see Jackson v. Quanex Corp.*, 191 F.3d 647, 668 (6th Cir. 1999) (finding "a longstanding and demonstrable policy . . . of tolerating a racially hostile environment in which racial graffiti and slurs and the disparate treatment of African-American workers took place regularly"). After thoroughly reviewing the statistical and documentary evidence submitted to the district court, we find that the evidence fails to demonstrate that Clarksville maintained a "standard operating procedure" of discriminating against African-Americans. Accordingly, the district court erred in applying the continuing-violations theory, and we hold that Austion's 1998 demotion claim was not timely filed under Title VII.

Austion also brought his 1998 demotion claim under the THRA. A claim under the THRA must be filed "within one year after the alleged discriminatory practice ceases." Tenn. Code Ann. § 4-21-311(d). Austion did not file suit in the district court until September 2003, which is much more than one year after his 1998 demotion. In an attempt to save his claim, Austion again appeals to the continuing-violations theory. The Tennessee Supreme Court has recognized that the plain language of the "THRA's statute of limitations incorporates the continuing[-]violation exception." *Booker v. Boeing Co.*, 188 S.W.3d 639, 647 (Tenn. 2006). However, "the THRA's statute of limitations does not operate to extend the limitations period on discrete acts of discrimination." *Id.* (citing *Weber v. Moses*, 938 S.W.2d 387, 391 (Tenn. 1996)).

Because the 1998 demotion is a discrete act of discrimination, the THRA's statutorily

incorporated continuing-violations exception does not extend the limitations period here. Moreover, even if Tennessee courts would extend the THRA limitations period where the employer engages in a "longstanding and demonstrable policy" of discrimination, *see id.* at 646 n.2 (noting that the Tennessee Supreme Court was not addressing and therefore not expressing an opinion concerning a "pattern-or-practice" claim, which is equivalent to the Sixth Circuit's "longstanding and demonstrable policy" claim), Austion has failed to establish that such a policy existed in the CPD. Therefore Austion did not timely file his 1998 demotion claim under the THRA.

Because Austion did not timely assert his 1998 demotion claim under either Title VII or the THRA, there is no jurisdictional basis for that claim, and the district court erred in refusing to dismiss it.

### 2.    2001 and 2002 Failure-to-Promote Claims

Austion also asserted his 2001 and 2002 failure-to-promote claims under both Title VII and the THRA. Austion did not explicitly present his 2001 failure-to-promote claim to the EEOC, and he is therefore barred from asserting this claim under Title VII. Austion, however, did include his 2002 failure-to-promote claim in his August 2002 EEOC charge, and the EEOC issued a right-to-sue letter on September 6, 2002. Once the administrative agency notifies the plaintiff of the dismissal of the charge by issuing a right-to-sue letter, the plaintiff has 90 days to file a civil action. 42 U.S.C. § 2000e-5(f)(1); *Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001). Austion did not file this lawsuit until September 15, 2003, which is more than a year after he received the right-to-sue letter.

The district court recognized this procedural deficiency but nevertheless found that Austion's failure to file within the 90-day time period was cured by the continuing-violations theory. We,

10

however, have expressly held that "[t]he continuing[-]violation doctrine . . . does not relieve a plaintiff of the need to file an action within 90 days of receiving the right-to-sue letter." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 461 (6th Cir. 2001). The district court thus erred in applying the continuing-violations doctrine to extend the 90-day filing period, and we hold that Austion's 2001 and 2002 failure-to-promote claims are time-barred under Title VII.

These claims are also untimely under the THRA. As previously noted, a claim under the THRA must be filed "within one year after the alleged discriminatory practice ceases." Tenn. Code Ann. § 4-21-311(d). Even though Austion's last promotion denial occurred in May 2002, he did not file suit until September 2003, more than one year later, and we therefore lack jurisdiction under the THRA. Moreover, as discussed above, the statutorily incorporated continuing-violations exception to the THRA's statute of limitations does not extend the limitations period on "discrete acts of discrimination." *Booker*, 188 S.W.3d at 647 (citing *Weber*, 938 S.W.2d at 391). Because both the 2001 and 2002 promotion denials are discrete acts of discrimination, the continuing-violations theory does not apply.

Austion attempts to save his 2001 and 2002 failure-to-promote claims by arguing that he actually brought these claims under 42 U.S.C. § 1981. While Austion's complaint did state that Clarksville's refusal to promote him violated § 1981, we find that he clearly abandoned § 1981 as a basis for these claims. After filing his complaint, Austion did not refer to or in any way invoke § 1981; he did not assert § 1981 in any of his proposed jury instructions or other motions submitted to the district court. We therefore find that he cannot now, having learned of his procedural deficiencies under Title VII and his jurisdictional dilemma under the THRA, appeal to § 1981 — a statutory basis which he has already abandoned — for the sole purpose of saving his 2001 and 2002

11

failure-to-promote claims.[5]

Because Austion has not timely filed his failure-to-promote claims under Title VII or the THRA, we find that the district court erred in failing to dismiss these claims.

### 3.     Hostile Work Environment Claim

Austion asserted his hostile work environment claim under Title VII. A hostile work environment claim brought under Title VII is "comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). "It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* "Provided that an act contributing to the claim occurs within the filing period, the entire period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* In Austion's June 2003 EEOC charge, he alleged that the work environment had become hostile because of incidents that occurred in May 2003. The EEOC issued a right-to-sue-letter on June 23, 2003, and Austion filed suit on September 15, 2003, which is less than 90 days after receipt of the right-to-sue letter. Consequently, his hostile work environment claim was timely filed under Title VII. Moreover, he can rely on past incidents, including the time-barred acts of discrimination, such as the 2001 and 2002 promotion denials and the 1998 demotion, in establishing his hostile work environment claim. *See id.* at 113, 117.

---

[5]Had Austion truly brought his failure-to-promote claims under 42 U.S.C. § 1981, these claims would have been timely. 28 U.S.C. § 1658 establishes a four-year statute of limitations for employment discrimination claims brought under § 1981. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); *Anthony v. BTR Auto. Sealing Sys.*, 339 F.3d 506, 514 (6th Cir. 2003). Because Austion filed suit on September 15, 2003, a § 1981 claim would have encompassed his 2001 and 2002 failure-to-promote claims, which occurred less than four years prior to his filing of suit. Moreover, we have recognized that discrimination claims which are barred under Title VII's procedural requirements may nevertheless be asserted under § 1981. *See Tartt v. City of Clarksville*, 149 F. App'x 456, 463 (6th Cir. 2005) (unpublished case).

**4.      Retaliation Claim**

In Austion's June 2003 EEOC charge, he complained that CPD retaliated against him in May 2003 for filing his previous EEOC charges. As previously discussed, the EEOC issued a right-to-sue-letter on June 23, 2002, and Austion filed suit on September 15, 2003, which is within the 90-day filing period. Therefore, like his hostile work environment claim, Austion's retaliation claim was timely asserted under Title VII.

**B.      Evidentiary Issues**

Clarksville raises three evidentiary issues on appeal, contending that the district court erred by (1) allowing Austion to reference a "less qualified" standard in establishing his failure-to-promote claims, (2) allowing Austion to introduce the discipline of CPD employees not similarly situated to himself in establishing his demotion and failure-to-promote claims, and (3) allowing Austion to introduce evidence of discrimination from other CPD employees dating more than 15 years prior to trial in establishing his hostile work environment claim.

The first two evidentiary challenges relate to Austion's demotion and failure-to-promote claims. Because we find that those claims were untimely and not properly before the jury, these evidentiary issues are moot and need not be addressed.[6] We must still consider Clarksville's challenge to the admission of evidence from other CPD employees involving events that occurred

---

[6]The mere fact that the district court admitted evidence supporting Austion's 1998 demotion and 2001 and 2002 failure-to-promote claims, even though those claims were not properly before the court, does not require a new trial. Evidence surrounding these instances is entirely relevant and admissible for Austion's hostile work environment claim. *See Morgan*, 536 U.S. at 113, 117 (noting that a plaintiff may introduce evidence of prior discriminatory acts "as background evidence in support of a timely [Title VII] claim" and stating that "the entire period of the hostile environment may be considered by a court for the purposes of determining liability"); *Jackson*, 191 F.3d at 668 (noting that "even evidence of conduct that is time-barred may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue") (internal quotations and citations omitted).

long before trial, such as the display of a racist cartoon in 1992 and a few instances in the late 1980s and early 1990s where the word "nigger" was used throughout the department.

We "review a district court's evidentiary rulings for abuse of discretion, and a district court's determination will be reversed only if the abuse of discretion caused more than harmless error." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 897 (6th Cir. 2004). Because Clarksville did not object at trial to this evidence, we review only for plain error. *See Preferred RX v. Am. Prescription Plan*, 46 F.3d 535, 548 (6th Cir. 1995).

Under the Supreme Court's guidance in *Morgan*, a plaintiff may introduce evidence of prior discriminatory acts "as background evidence in support of a timely claim." 536 U.S. at 113. When dealing with hostile environment claims, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117. "Given, therefore, that the incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." *Id.* at 118.

Under *Morgan*, most of the evidence of which Clarksville complains is admissible because it occurred during the time period of the alleged hostile work environment. Moreover, the evidence is also admissible as "background evidence" in support of a timely hostile work environment claim. While it is arguable that some of the challenged evidence — including a few of the "nigger" comments in the late 1980s and early 1990s and the circulation of the racist cartoon in 1992 — likely predated the hostile environment period, this evidence is wholly relevant background evidence for demonstrating a racially hostile work environment. Clarksville did not object to this evidence at trial, thereby depriving the district court of an opportunity to exclude it on a piecemeal basis, and Clarksville has failed to demonstrate that the admission of this evidence constituted plain error.

14

**C.      Denial of Clarksville's Renewed Motion for Judgment as a Matter of Law**

Clarksville contends that the district court should have granted its renewed motion for judgment as a matter of law on Austion's failure-to-promote claims, hostile work environment claim, and retaliation claim. Because we have already found that Austion's failure-to-promote claims were not timely filed under Title VII or the THRA and therefore not properly before the district court, we need not address whether the district court erred in refusing to grant judgment as a matter of law on these claims. We must nevertheless address the hostile work environment and retaliation claims.

**1.      Hostile Work Environment Claim**

We review *de novo* a district court's denial of a party's renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). *United States v. Alpine Indus., Inc.*, 352 F.3d 1017, 1022 (6th Cir. 2003). When engaging in this review, we use the same standard applied by the district court. *Phelps v. Yale Sec.*, 986 F.2d 1020, 1023 (6th Cir. 1993). "The evidence should not be weighed. The credibility of the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury." *Schwartz v. Sun Co., Inc.*, 276 F.3d 900, 903 (6th Cir. 2002) (quoting *K & T Enterprises v. Zurich Ins. Co.*, 97 F.3d 171, 175-76 (6th Cir. 1996)). We must "view the evidence in the light most favorable to the party against whom the motion is made," and draw "all reasonable inferences in [its] favor." *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 482 (6th Cir. 1990). "The motion should be granted, and the district court reversed, only if reasonable minds could not come to a conclusion other than one favoring the movant." *K & T Enterprises*, 97 F.3d at 176.

"Under the three-step burden-shifting framework for analyzing claims of employment discrimination under Title VII, a plaintiff must first set forth a *prima facie* case of discrimination."

15

*Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001). "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for [its actions]." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "If the employer carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination." *Newman*, 266 F.3d at 405.

To establish a *prima facie* case of hostile work environment based on race under Title VII, a plaintiff must show: 1) he is a member of a protected class; 2) he was subjected to unwelcome racial harassment; 3) the harassment was based on race; 4) the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and 5) employer liability existed. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). To constitute a hostile work environment, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotations omitted). The defendant's conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive[.]" *Id.* Additionally, the plaintiff must subjectively perceive the environment to be abusive. *Newman*, 266 F.3d at 405 (citing *Harris*, 510 U.S. at 21-22).

Clarksville attacks each incident of racial hostility, as if it were standing alone, arguing that Austion was unaware of the noose hanging in the police station or unaware of a few discriminatory comments. But Clarksville fails to recognize that the collective import of all these incidents — most of which both Austion and the CPD had knowledge of — provide adequate evidence for the jury to

16

infer that a racially hostile work environment existed and that Austion was subjectively affected by this environment. The evidence of both an objective and subjective hostile work environment includes: (1) the letter circulated by Capital Books referring to Austion and the other African-Americans who filed EEOC charges as "complainers" and "disgruntled employees"; (2) Chief Smith's yelling at Austion for making allegations of racial harassment and characterizing Austion's allegations as "disloyal" and "disrupting"; (3) the drive-by shooting at Officer Hisel's house and the suspicion of intra-department racial motivation; (4) the noose hanging in the police station; (5) the racist remarks of which Austion was aware; and (6) Austion's testimony that his work conditions cause him to feel defensive and uneasy at work, suffer from depression, suffer from paranoia, and carry a gun and tape recorder everywhere he goes. While we readily admit that the evidence of hostile work environment harassment is somewhat meager, we are not persuaded that a reasonable juror could not find that a hostile work environment existed, especially when the evidence is viewed in the light most favorable to Austion. Consequently, we affirm the district court's denial of Clarksville's renewed motion for judgment as a matter of law on Austion's hostile work environment claim.

## 2. Retaliation Claim

To demonstrate a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000).

Clarksville challenges the third *prima facie* element, claiming that Austion did not prove an "adverse employment action" or "severe or pervasive retaliatory harassment." When viewing the evidence in the light most favorable to Austion, we find that the jury could have found that an adverse employment action occurred. To demonstrate an adverse employment action for purposes of Title VII's anti-retaliation provision, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, -- U.S. -- , 126 S. Ct. 2405, 2415 (2006) (internal quotations omitted). Austion testified that his on-call schedule was changed in October 2003, which was after he filed his EEOC charges. The jury could have found that this change in work hours, requiring Austion to be on call throughout the night while continuing to work his regular shift from 8:00 a.m. to 4:00 p.m., "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," thus amounting to an adverse employment action. *See id.*

In any event, Austion presented sufficient evidence to support the jury's verdict that he was subjected to severe or pervasive retaliatory harassment. That evidence includes: (1) the CPD's extreme delay in processing his commendation; (2) the letter circulated by Captain Brooks referring to those who filed EEOC charges as "complainers" and "disgruntled employees"; (3) Chief Smith's castigation of Austion for filing EEOC charges; (4) the change in Austion's on-call schedule; (5) the CPD's decision to target Austion as a suspect in the drive-by shooting of Officer Hisel's house. We find that it is not unreasonable for the jury to have found that Austion satisfied the third element of his *prima facie* case for retaliation, and we therefore affirm the district court's denial of Clarksville's renewed motion for judgment as a matter of law.

18

**D.**     **Denial of Clarksville's Motion for a New Trial and Motion for Remittitur**

Clarksville lastly argues that the district court should have granted a new trial because the damages awarded by the jury were excessive. Clarksville alternatively contends that the verdict should be remitted. The jury award in this case amounted to $300,000, and it breaks down as follows: (1) $100,000 for the 1998 demotion claim and the 2001 and 2002 failure-to-promote claims; (2) $100,000 for the hostile work environment claim; and (3) $100,000 for the retaliation claim. The $100,000 for the demotion and failure-to-promote claims must be reversed because Austion's filing of these claims was untimely; consequently, we must consider only the remaining $200,000 in damages.

In the absence of undue passion and prejudice on the part of the jury, we review for abuse of discretion a district court's refusal to grant a remittitur or a new trial based on excessive damages. *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 424 (6th Cir. 1999). We may not disturb a jury award unless it is against the clear weight of the evidence as a whole. *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 818 (6th Cir. 1999). To be reduced, the award must be (1) beyond the range supportable by proof, (2) so excessive as to shock the conscience of the court, or (3) the result of a mistake. *Leila Hosp. and Health Ctr. v. Xonics Med. Sys., Inc.*, 948 F.2d 271, 278 (6th Cir. 1991).

Clarksville argues, without citing any legal authority, that Austion's damages — which include an incessant uneasiness and defensive feeling at work, lack of sleep, inability to eat, decreased interest in hobbies, depression, and paranoia causing him to carry a gun and tape recorder everywhere he goes — are insufficient to support the jury's award of $200,000. We reject this argument and find that if the jury believed Austion's testimony regarding his damages, an award of

19

$200,000 is not against the weight of evidence and does not shock the conscience of this court. Therefore, the district court did not abuse its discretion in refusing to grant a new trial or in refusing to order remittitur.

### III.  Conclusion

For the foregoing reasons, we **REVERSE** the judgment and the $100,000 award on Austion's demotion and failure-to-promote claims because these claims were not timely asserted and therefore the district court lacked jurisdiction to consider them.  And we **AFFIRM** the judgment on Austion's hostile work environment and retaliation claims, and the corresponding awards of damages.