**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0239n.06
Filed: May 6, 2008

No. 06-6084

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARTIN HALL, JR., | ) | |
| | ) | **ON APPEAL** FROM THE |
| **Plaintiff-Appellee,** | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| CITY OF CLARKSVILLE, | ) | |
| | ) | **O P I N I O N** |
| **Defendant-Appellant.** | ) | |
| | ) | |

Before: **BATCHELDER, MOORE, and McKEAGUE, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** The City of Clarksville ("Clarksville")
appeals the denial of motions for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a)-(b),
for a new trial pursuant to Fed. R. Civ. P. 59, and for remittitur. Plaintiff-Appellee Martin Hall, Jr.,
("Hall") brought suit in the U.S. District Court for the Middle District of Tennessee for violations
of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and of the Tennessee Human
Rights Act, T.C.A. 4-21-101 et seq. The jury found that race did not serve as a motivating factor in
Clarksville's decision not to promote Hall to the rank of sergeant; that Hall was subjected to a
racially hostile work environment; and that Clarksville retaliated against Hall for engaging in
protected activity. The jury awarded Hall compensatory damages in the amount of $100,000 related
to his hostile-work-environment claim and $50,000 related to his retaliation claim. We **AFFIRM**

the denial of Clarksville's renewed motion for judgment as a matter of law; motion for a new trial; and motion for remittitur.

## I. FACTS AND PROCEDURE

### A. Factual Background

At the time of trial, Hall had worked as a detective for the Criminal Intel Unit of the Clarksville Police Department (the "Department") for two years. Prior to his current position in the Department, he worked as a detective investigator and before that as a Field Training Officer.

The trial evidence revealed a series of conflicts between Hall and his coworkers and supervisors in the Department, beginning in the late 1980s and continuing until 2004. The first three incidents, one of which targeted Hall, took place during the late 1980s and early 1990s. In the late 1980s, Mark Smith, then an officer-in-training and now the Clarksville Police Chief, referred to fellow African-American officers using the derogatory term "nigger." Joint Appendix ("J.A.") at 399 (Trial Tr. at 401). Also in the late 1980s, Officer John Hunt referred to African-American officers using the same racial slur as Smith had used. There is no evidence in the record regarding when Hall learned of these two comments.

The third incident that took place during this early period involved an extremely offensive cartoon that represented African-Americans as embodying racist stereotypes. Hall testified that when he came into work one day in 1992 or 1993 he encountered a white officer, Michael Caver, sitting at a table waiting to show fellow officers a racially derogatory cartoon. Hall felt offended by the cartoon but did not report it because he was new to the job and afraid of the repercussions from complaining. Other employees who worked the shift also saw the cartoon, including one of Hall's supervisors, Lieutenant Goslawski. Indeed, Caver's report about the incident stated that Lt.

2

Goslawski himself showed the cartoon to Hall. The Police Chief at the time, Johnny Rosson, warned Caver not to bring "off color material" into the precinct and ordered him to contact another supervisor regarding sensitivity training. No evidence establishes that Caver underwent the training.

A further series of incidents took place between the late 1990s and Hall's filing of his first Equal Employment Opportunity Commission ("EEOC") complaint in July 2002. Beginning in 1998, Hall's first-line supervisor Lieutenant Carney repeatedly told Hall that he could not ride with his friend and co-worker, Detective Tony Blakely, because Carney "d[id]n't want two black detectives riding together." J.A. at 271, 330 (Trial Tr. at 130, 207). Hall testified that complaints regarding him and Blakely riding together reached then Police Chief Lavoyed Hudgins.

Another two incidents during this time period involved racial slurs. Lieutenant Carney made a statement in 2000 that used the initial "N" with reference to Detective Blakely. An employee who heard the comment, Jan Morrison, interpreted the use of the initial as signifying the word "nigger." J.A. at 355-56 (Trial Tr. at 277-78). Trial testimony suggested that Carney did not experience any discipline, even though the Department's official policies provided that the discipline of an officer who used racial slurs could extend to termination. Hall did not present any evidence at trial regarding when he became aware of Carney's comment. Another racial slur made by one of Hall's superiors, however, targeted Hall. Officer Travis Hisel testified that when Hall came to the shooting range a few minutes late one day in the summer of 2002, Sergeant Steve Posten said: "Damn nigger, showing up late." J.A. at 362 (Trial Tr. at 286). Hisel reported the comment to Lieutenant Ron Knight, then head of the Professional Integrity Unit (Internal Affairs), and to Chief Smith. Clarksville presented no evidence at trial establishing that Knight or Smith took any disciplinary action against Posten. Hall testified that he was aware that his supervisors had made racially

3

derogatory comments referencing him and that he "was upset about it . . . [and] was more upset about the fact that the sergeant . . . didn't receive any type of punishment." J.A. at 319-20 (Trial Tr. at 181-82).

When Hall was working for the Criminal Intel Unit in District 3 in late 2001 and early 2002, he came into work one day to find a noose hanging at the front of the building, toward the back wall where he had set up a computer workstation. The noose, made of 550 cord, was hanging over a partition beside the computer and could be seen as one walked in the doorway. The noose hung in a common area, at the computer station where Hall worked "[a]ll the time." J.A. at 315 (Trial Tr. at 177). Hall reported the noose to the Federal Bureau of Investigation within the first month of seeing it. Hall did not make a complaint within the Department; he explained at trial: "After all I had gone through of filing the grievances and complaints, there was no way I was going to report the noose as a form of retaliation to the same people that was retaliating against me." J.A. at 316 (Trial Tr. at 178). White officers testified at trial that they did not perceive the noose as a symbol of racial hostility but rather as signifying cowboys or lassos or as merely a knotted cord. The Department eventually investigated the noose; the Department's ultimate response was to conduct sensitivity training.

In addition to the incidents that took place before July 2002, in 2005 a Department employee circulated an email throughout the Department involving a racist "joke about a man named Tyrone . . . referring to [him] as nappy head, nappy head, nappy head." J.A. at 479-80 (Trial Tr. at 571-72).

While the above eight incidents—four involving racial slurs, the racist cartoon, the rule against riding with Blakely, the noose, and the racially derogatory email—were race-based on their face, Hall also presented evidence of three disciplinary and investigative actions directed at him that

4

a reasonable factfinder might or might not interpret as motivated by race. The first disciplinary incident occurred in the spring of 2001. Hall owned a business that sold cell phones, pagers, and other similar devices. Once when an employee was delivering a phone, some people near a club called the employee over to show him how to program the phone. Other Clarksville police officers who were coincidentally monitoring the club for illegal drug activity suspected Hall's employee of selling drugs. Upon hearing of this suspicion, Hall looked up the employee on a Department computer to see if he had a criminal record and discovered that he had no drug arrests on his record. Hall subsequently received a counseling statement disciplining him for using a Department computer allegedly for personal benefit.

The second disciplinary incident, in December 2002, resulted from Hall's decision to work a day shift instead of his usual evening shift to accommodate a work-related court date. Hall testified that in so doing he had followed Department custom and practice. Nevertheless, Hall received a disciplinary report, even though another white detective who did the same thing two days before had not been similarly disciplined.

The third incident did not involve disciplinary action but rather an investigation targeting Hall that, according to Hall, lacked a credible evidentiary basis. Chief Mark Smith initiated an investigation of Hall for drug dealing beginning, possibly, sometime in 2004. A complainant did not give Detective Hall's name, but the complainant picked Detective Hall's picture out of a board of photographs of police officers. The complainant also gave the name and the hometown of the suspected drug-dealer's wife; yet, these were incorrect with respect to Detective Hall's wife. The complainant identified the drug dealer's car as a Crown Vic having the same color as Hall's car, but all detectives in Clarksville drove unmarked Crown Vics (though not necessarily of the same color).

5

Hall testified that he was not selling drugs; that he was not informed of the investigation from the start; that he learned of the investigation only near its conclusion; and that he was never told the details of the investigation.

The remaining trial evidence concerns conflicts between Hall, his supervisors, and his coworkers that related to Hall's complaints of racial discrimination and his alleged insubordination. In May 2003, Chief Smith called Hall and other African-American detectives who had filed complaints of discrimination into his office for a meeting. Hall testified that Smith said:

> that he didn't care what I did. i.e., He told me he doesn't care if I file an EEOC complaint, because then he'd respond to it. He didn't care if I went to the DA's office and tried to get a warrant for his arrest. He didn't care, because he would have to respond to it. He didn't care if I went to the EEOC, the FBI, or whomever, because he would have to respond to it. He didn't care if I filed a lawsuit, because then he would be the one to respond to it. . . . But what he did care about was me speaking degradingly about the Police Department.

J.A. at 299-300 (Trial Tr. at 161-62). Hall testified that Smith told him not to make complaints about discrimination while he was on duty. Smith testified that he held the meeting with the purpose of informing both African-American and white officers that they should not pursue personal agendas at work.

In 2004 or 2005, Lieutenant Knight, then in charge of the Professional Integrity Unit, distributed a letter throughout the Department ("the Department") that supported Chief Smith with respect to the charges of discrimination against him. Hall felt that the report targeted him among other employees as "making trouble for the Chief," although it did not cite Hall by name. J.A. at 317-19 (Trial Tr. at 179-81). An African-American officer, Charles Brooks, had originally written the letter "to establish . . . that not all African Americans felt that way [that Smith discriminated], and that some of us felt that he was doing a good job." J.A. at 502 (Trial Tr. at 616). The Director

6

of Human Resources for Clarksville investigated the letter at issue and discovered that Lieutenant Knight had circulated the letter, which implicitly referenced several officers including Hall. The Director and the Mayor of Clarksville informed Chief Smith of the letter and ordered him to stop its circulation, but Smith did not stop the distribution of the letter. While Lieutenant Knight had spent at least fifteen minutes of on-duty time circulating the letter, and more personal time doing so, he was not disciplined for circulating the letter.

Hall filed several grievances in 2004, after he filed the second of two EEOC complaints in May 2003. In May 2004, Hall filed a grievance relating to a meeting in which "Deputy Chief Bob Davis . . . Sergeant Denton, Sergeant Mishoe, Captain Brooks, [and] Captain Gray . . . took turns taking pot shots at [Hall], accusing [him] of investigating another detective's case." J.A. at 305 (Trial Tr. at 167). Hall testified that the allegation against him was not true.

Hall also filed a grievance relating to his response to a crime scene, although the record does not make clear exactly how the grievance drew a connection between the incident and alleged racial discrimination. Sergeant Mishoe called Hall to tell him to respond to a crime scene, but Mishoe did not know its location and told Hall to call Sergeant Minton. Before Hall could call Minton, the officer on the scene telephoned Hall to tell him that he was not needed. Sergeant Mishoe, however, gathered from Minton that Hall had refused to respond to the scene. Chief Smith replied to Hall's grievance by agreeing with Mishoe's version of events.

In November 2004, Hall filed a grievance regarding disciplinary action taken against him for his refusal to sign a memorandum regarding radio procedures. According to Hall, everyone in the Department was having problems with the batteries in their radios. As a result, Hall feared that the memo, which stated that an officer who did not respond to his or her radio would be disciplined,

7

unfairly set up Hall for future disciplinary action. When Hall refused to sign the memo, Sergeant Mishoe ordered him to "[g]et up to the captain's office." J.A. at 307 (Trial Tr. at 169). Hall responded: "Well, Sarge, you don't have to talk to me like that. Like I'm a dog or something." *Id.* Hall was not the only officer who did not sign the letter. Regardless, Sergeant Mishoe viewed Hall's statements and actions as insubordination, and Captain Brooks relieved Hall of duty for the remainder of the day. Chief Smith responded by transferring Hall rather than disciplining him in another manner.

Hall finally alleges that at an unspecified time when he was working in District 3, his Captain retaliated against him by asking him to go through a "pre-bump" process. This meant Hall needed to state immediately where he wanted to work the following year. The ordinary process, according to Hall, was to sign up in September for the district in which one wanted to work; the assignments would then be made on the basis of seniority.

Hall testified that as a result of the racially hostile work environment and retaliation he has experienced, he is emotionally devastated; has needed to see a psychologist; experiences extreme physical symptoms of stress; feels paranoid; cannot sleep at night; and has filed for a divorce from his wife of twenty-four years, whom he still loves.

## B. Procedural Background

On July 8, 2002, Hall filed a complaint with the EEOC alleging race discrimination as well as hostile work environment and retaliation in violation of Title VII, and he received a right to sue letter from the EEOC on December 23, 2002. Hall filed a complaint with the Tennessee Human Rights Commission on July 8, 2002 alleging "unfair treatment and terms and conditions of employment" on account of race. Hall filed a second complaint with the EEOC on May 7, 2003,

8

alleging that since the filing of his prior charge with the EEOC he had suffered retaliatory harassment.

Hall filed a complaint in the U.S. District Court for the Middle District of Tennessee on December 19, 2003, alleging violations of Title VII relating to the denial of a promotion to the rank of sergeant, a racially hostile work environment, and race-based retaliation, as well as violations of the Tennessee Human Rights Act. Clarksville filed a motion to dismiss and for summary judgment on November 29, 2004. After Hall filed a response in opposition to the motion for summary judgment and Clarksville filed a reply, the district court denied Clarksville's motion to dismiss and for summary judgment on March 15, 2005. The district court also denied in part, granted in part, and reserved in part Clarksville's motion in limine to exclude certain pieces of evidence on August 23, 2005.

At the close of all proof, on March 6, 2006, Clarksville moved for judgment as a matter of law, which the district court denied. The jury verdict found that Hall had failed to prove that race constituted a motivating factor in the decision not to promote him; that Hall had proved a racially hostile work environment; and that Hall had proved race-based retaliation. On March 8, 2006, the district court entered judgment for Hall in accord with the jury verdict, in the amount of $150,000. On March 20, 2006, Clarksville filed a renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b); or, in the alternative, a motion for a new trial pursuant to Fed R. Civ. P. 50(b)(1)(B) and Fed R. Civ. P. 59; and a motion for remittitur. Hall filed a response on April 20, 2006. The district court denied Clarksville's motion on July 18, 2006, and Clarksville filed a timely notice of appeal.

## II. ANALYSIS

### A. Standard of Review

We review de novo the district court's denial of Clarksville's renewed motion for a judgment as a matter of law. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004), *cert. denied*, 546 U.S. 821 (2005). Judgment as a matter of law pursuant to Rule 50 is appropriate only when the non-moving "'party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Id.* at 722 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)).

We review de novo the district court's denial of the renewed Rule 50(b) motion. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 899 (6th Cir. 2004), *cert. denied*, 544 U.S. 975 (2005). Under the applicable standard, we "'must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, [we] should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 900 (quoting *Reeves*, 530 U.S. at 150-51). In reviewing the district court's denial of Clarksville's motion, we are not concerned with each stage of the burden-shifting framework governing Title VII claims. *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997). Instead, we evaluate whether "the record contains evidence upon which a reasonable trier of fact could have concluded as the jury actually did." *Id.*

We review the district court's denial of Clarksville's motion for a new trial for an abuse of discretion. *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir. 2000). We reverse the district court's denial of a motion pursuant to Rule 59 only if we have "a definite and

firm conviction that the trial court committed a clear error of judgment." *Id.* (quotation omitted). A district court may grant a new trial when it believes "that the verdict is against the clear weight of the evidence." *Id.* In reviewing a district court's ruling on a motion for a new trial, we "must focus on the ultimate question of discrimination rather than on whether a plaintiff made out a prima facie case." *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 529 (6th Cir. 2005) (quotation omitted). "[N]evertheless . . . whether the plaintiff made out a prima facie case may be relevant to [the panel's] review of that ultimate question." *Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004) (quotation omitted).

We review the district court's denial of Clarksville's motion for remittitur for an abuse of discretion. *Id.* at 564. "A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive . . . as to shock the judicial conscience of the court." *Id.* (quotation omitted).

## B. Clarksville's Motions

The instant case is remarkable, in part, because it involves the same police department and contains several overlapping facts with *Austion v. City of Clarksville*, 244 F. App'x 639 (6th Cir. 2007). Kenneth Austion ("Austion") is an African-American who worked as a police officer in the Department. Like Hall, Austion brought an action against Clarksville alleging violations of Title VII and the Tennessee Human Rights Act. Specifically, Austion alleged claims of discrimination against him on the basis of race when the Department denied him a promotion, a racially hostile work environment, and retaliation, as well as a race-based demotion. *Id.* at 643, 646. A jury found Clarksville liable regarding all four of Austion's claims. *Id.* at 646.

11

Shared facts between *Austion* and the instant lawsuit include: the use of the word "nigger" as a racial slur in the late 1980s; the racist cartoon; the noose; and the circulation of Captain Brooks's letter defending Chief Smith. *Id.* at 643-44, 646. Other facts on the record in *Austion* parallel the retaliatory actions taken against Hall for filing grievances and complaints: Chief Smith's yelling at Austion in retaliation for filing his charge with the EEOC, an investigation of Austion regarding illegal drug and prostitution activity, and a change in Austion's on-call schedule from mostly daytime to mostly nighttime hours. *Id.* at 645. In addition, Austion, like Hall, testified that he was aware of racist remarks by Department employees and that a racially hostile work environment had a negative effect on his work environment and personal life. *Id.* at 652.

The records in *Austion* and the instant case do differ regarding some facts. Facts in Austion not mirrored in the record supporting Hall's allegations include: the presence of racially insensitive figurines on a police officer's desk and the suspicion placed on Austion by investigators for a drive-by shooting at another officer's house. *Id.* at 645-56. The facts present in this case but that were absent in *Austion* include: the prohibition on Hall's riding with Blakely; the disciplinary report regarding Hall's use of a Department computer; the accusation that Hall refused to respond to a crime scene; the accusation that Hall investigated another detective's case; a superior's use of a racial slur specifically targeting Hall; a racially derogatory email circulated in 2005; and the requirement that Hall undergo a "pre-bump" process regarding his work assignment.

In *Austion*, we affirmed the district court's denial of Clarksville's renewed motion for judgment as a matter of law regarding both Austion's hostile-work-environment and retaliation claims, as well as the denial of Clarksville's motions for a new trial and for remittitur. *Id.* at 651-54. The evidence in Hall's case is at least as persuasive as the evidence that we reviewed in *Austion*.

12

In its memorandum of law attached to its order denying Clarksville's motion for summary judgment, the district court explained why genuine issues of material fact existed regarding Hall's hostile-work-environment and retaliation claims. Dist Ct. Record #52 at 14-18 (Mem. Denying Def.'s Mot. Dismiss & Mot. Summ. J.). As required by our summary-judgment standard, these issues were resolved by the jury. We are not now at liberty to reweigh the evidence, but rather we must evaluate whether a reasonable juror could have reached the conclusions reached by the jury in this case. In denying Clarksville's Rule 50 and Rule 59 motions following trial, the district court incorporated its prior memorandum of law denying the motion for summary judgment and elaborated further why it was rejecting Clarksville's arguments for judgment as a matter of law and for a new trial. Dist. Ct. Record #140 at 2 (Mem. Denying Def.'s Mots. J. as a Matter of Law & a New Trial). We agree with the district court's holding that Clarksville has presented no convincing argument "that the jury erred in returning a verdict in favor of [Hall] on his hostile work environment claim." *Id.* at 6. We also agree with the district court that "[t]he jury was well within its province to find that [Hall] was subjected to retaliation for his protected Title VII activity." *Id.* In view of the evidence submitted to the jury and in light of the district court's well-reasoned explanation for its decision, we affirm the district court's denial in this case of Clarksville's motions for judgment as a matter of law and for a new trial.

Finally, the jury awarded Hall $100,000 damages on his hostile-work-environment claim and $50,000 damages on his retaliation claim. This is less than the $200,000 total the jury awarded the plaintiff in *Austion* on the basis of similar facts ($100,000 for Austion's hostile-work-environment claim and $100,000 for his retaliation claim). *Id.* at 653. We concluded in *Austion* that the jury award was "not against the [clear] weight of evidence and [did] not shock the conscience of this

court." *Id.* at 654. We similarly conclude in this case that the jury award is not excessive, did not result from bias or prejudice, and does not shock the conscience of the court. Therefore the district court did not abuse its discretion in denying remittitur.

### III. CONCLUSION

For the reasons explained above, we uphold the denial of Clarksville's renewed motion for judgment as a matter of law; motion for a new trial; and motion for remittitur. We **AFFIRM** the judgment of the district court.