**Louis ARTIS, Plaintiff–Appellant,**

v.

**FINISHING BRANDS HOLDINGS, INC., Defendant–Appellee.**

No. 15–5337.

United States Court of Appeals, Sixth Circuit.

Jan. 26, 2016.

BEFORE: SUTTON and KETHLEDGE, Circuit Judges; BECKWITH, District Judge.*

**OPINION**

SANDRA S. BECKWITH, District Judge.

Louis Artis appeals the summary judgment granted to Finishing Brands Holdings, Inc., ("FB") on Artis's failure to promote and hostile work environment claims. Artis argues that the district court erred in concluding that he was not the "plainly superior candidate" for promotion, and in concluding that he had not established a genuine dispute about pretext. He also contends that the court erred with respect to his hostile work environment when it found he had not shown severe or pervasive racial harassment.

We affirm the district court's conclusion that Artis was not the "plainly superior candidate," but reverse its conclusion that Artis failed to establish a genuine factual

---

* The Honorable Sandra S. Beckwith, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

dispute about pretext regarding his failure to promote claim. We also affirm with respect to Artis's hostile work environment claim.

Louis Artis was hired by FB's predecessor in 2000, to work in the Jackson, Tennessee manufacturing plant now owned by FB. FB manufactures spray guns and other industrial finishing equipment. Artis worked for over eight years as a machine operator and in the plant's buffing department. Sometime in 2009 he applied for an assembler position in Department 2195, in a group called the "pump cell." Tom Weaks is the Assembly Production Supervisor for that group, and Weaks offered Artis the job in August 2009. Department 2195 did not have a cell leader at that time, and other cell employees, including Weaks, Artis and Sherry Childs (a Caucasian coworker), performed the leader's duties as needed.

Bob Battle was FB's Director of Manufacturing at the Jackson plant. Jerry Day was hired by FB in June 2010 as a facility administrative coordinator, with responsibilities for human resource issues at the plant. Battle is Caucasian, and Day is African–American. On March 1, 2012, Battle, Weaks, and Kim Quick (leader of FB's "SPO" division) met to discuss several vacant positions, including that of cell leader in Department 2195. After that meeting, Battle told Day that Childs would be promoted to cell leader in Artis's cell, and he wanted Kay Meadows to apply for a supervisor position. Later that day, Day sent a memo to Betty Schultz at FB's corporate HR department, reporting that Battle, Weaks and Quick decided to "[p]ost position for Customer Service/Warehouse Supervisor or Lead. They are hoping for Kay Meadows to be successful in applying. Post position of Cell Leader over shipping if Kay get[s] the other position. Stevie Thomas is their recommending choice.

Post position of Cell Leader over pumps. Their recommendation is Sherry Childs. Not sure I agree." (R. 68–2, PAGEID 3002)

On March 14, 2012, Weaks completed performance evaluations for Artis and Childs. (R. 67–2, PAGEID 2988 (Artis) and R. 67–3, PAGEID 2993 (Childs).) The form includes ratings in nine performance areas using a 5–point scale, with 5 being the highest and 1 the lowest rating. Weaks generally gave Childs higher ratings for skill level and work quality and quantity, while Artis received higher ratings for interpersonal skills, and developing himself and others. Weaks wrote that Artis was a "role model for subordinates." Weaks wrote that Childs "... is the highest producing assembler I've had in 6 years. She continually seeks out more responsibility while keeping current responsibilities in top shape. She has no quality complaints linked to her. She is there for the team where ever needed. Many days I look to her as an assistant for the unusual issues that come up." (R. 67–3 at PAGEID 2996) Weaks gave Artis an overall rating of 3.5 and gave Childs 3.88.

On March 16, FB posted the position of cell leader in Department 2195, for which Artis and Childs both applied. Weaks and Day jointly interviewed both candidates, and completed a one-page matrix that evaluated the candidates in five areas: degree/diploma requirement; experience; skill/knowledge in decision making; skill/knowledge in leadership; and interpersonal. (R. 67, PAGEID 2985–2986) Each area was scored from 1–4, with 4 being the highest. Day gave Artis 16 points overall, and Childs 13; Weaks gave Artis 16 points overall, and Childs 17 points. Weaks chose Childs for the position, telling Artis that he did so because Childs was his most skillful assembler and had better organizational skills. Weaks

encouraged Artis to apply for future open positions.

After Childs was promoted, Artis testified that his relationship with her became "very difficult at times." Childs criticized his work to other members of his department, and was "snappy" towards him. Artis complained to Weaks and to Pete Kurtz, the plant's Operations Manager. Pete Kurtz was transferred to the Jackson plant in March 2012 to assume some of Battle's duties, and became Weaks's direct supervisor. Kurtz investigated Artis's complaints, and then met with Weaks, Artis, and Childs. Artis and Childs expressed their mutual frustrations, they apologized to each other, and the situation appeared to resolve. Artis testified that their relationship improved, as "that hostility is no longer there between the two of us." (R. 58–1, Artis Dep. at 277, PAGEID 641) If the situation with Childs should worsen again, Artis would be comfortable informing Kurtz, or reporting any concerns he may have about his workplace. (R. 59, Artis Dep. at 308–309, PAGEID 672–673) Since then, he has not received any discipline, and he was awarded a 3.5% pay increase on March 26, 2013.

Artis filed his EEOC claim in June 2012, alleging that he was not promoted to cell leader based on his race. His subsequent district court complaint alleged claims of hostile work environment, discrimination, retaliation, failure to promote, and demotion of employment, all based on race in violation of Title VII and the analogous Tennessee Human Rights Act, T.C.A. § 4–21–101, et seq. (R. 1) FB moved for summary judgment (R. 47), supported by a statement of undisputed material facts ("SUMF"). (R. 48) For purposes of its motion, FB conceded Artis's prima facie failure-to-promote claim, and asserted that it promoted Childs based on her higher evaluation scores, her seniority, and her better skills as an assembler. Childs began working for FB as a temporary employee in 2005, became a permanent employee in 2006, and had been in Department 2195 for four years before she became cell leader.

The district court evaluated Artis's pretext arguments under the two-prong analysis for failure to promote claims set forth in *Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 668 (6th Cir. 2013): "(1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination." In finding that Artis was not the "plainly superior candidate," the district court compared his prior experience with Childs's, and cited Weaks's testimony that Childs was his most productive assembler. Weaks had supervised Childs since May 19, 2008, when she moved to Department 2195; he had supervised Artis since September 28, 2009, when Artis was promoted to assembler. Weaks believed that both of them were qualified but that Childs was the stronger candidate. The district court rejected Artis's contention that his scores in the areas of experience and skill/knowledge in decision-making should have been much higher than Childs's. The court also discounted Day's testimony that Artis was the more experienced candidate, because Artis did not show that Day had personal knowledge of Artis's particular experience or skill as an assembler in Department 2195. In several categories such as skill/knowledge in leadership, both candidates received the same score. Given all of this evidence, the court held that no reasonable juror could find Artis to be the plainly superior candidate.

The district court then analyzed the "other evidence" of discrimination offered by Artis, applying a framework articulated by this Court in a trilogy of cases: *Rachells, supra; Griffin v. Finkbeiner,* 689 F.3d 584 (6th Cir.2012); and *Schrack v. R+L Carriers, Inc.,* 565 Fed.Appx. 441 (6th Cir.2014). The court considered the incidents as either (1) "atmosphere" evidence, related to actions taken by or involving Weaks, or by a non-decisionmaker who could have influenced Weaks's decision, or (2) evidence about non-party FB employees and their experiences. It ultimately concluded that most of the cited incidents were irrelevant to his failure-to-promote claim, because they were remote in time, involved dissimilar facts, and/or lacked probative value on the question of pretext. The evidence that the district court found both probative and relevant to that question included: (1) Day's testimony about events surrounding the March 1, 2012 meeting, and Battle's statement that Childs would be promoted; (2) Day's complaints to Betty Schultz about Battle's racist and discriminatory comments; and (3) Steven Smith's July 2013 EEOC charge, claiming that Weaks discriminated against him and subjected him to a hostile work environment based on his race.

Considering this evidence, the district court found that Artis had not established a triable issue on pretext. It found that Battle was not the "ultimate decisionmaker" by crediting Weaks's testimony that he decided to promote Childs. Weaks conceded that he would obtain Battle's approval or his "blessing," before finalizing any decision. Despite this admission, Artis had no evidence that anyone other than Weaks actually made the decision, or that Battle actually approved it. The court noted that Day's March 1 email to Schultz stated that Childs was "recommended" for the position, not that Battle and Weaks had already made a decision. They also recommended Stevie Thomas, an African American employee, as their choice for shipping cell leader if Meadows was successful in becoming a supervisor. While an improper consideration of race in one context could support an inference that it affected another decision, the court found nothing in Day's testimony suggesting that Weaks, Battle, or anyone else considered the candidate's race in making the recommendations or ultimately, the promotion decision.

Day also described a conversation with Battle about a production supervisor position, during which Battle told Day not to post the job because he did not "want a black in a position." Battle was referring to Edna Terry, an African American woman, who was interested in the job. Day testified: "I heard Bob say he didn't want a black in the position. When I asked him, what's wrong with Edna Terry, she's qualified, she has twenty years experience, he said, I don't want Edna Terry in that position. It was a black first, and then he called her name." (R. 62–1, Day Dep. at 186–187, PAGEID 1359–1360.) Day identified an email he sent to Betty Schultz on March 16, 2011 (R. 65, Day Dep. Ex. P, PAGEID 2207) as documenting this conversation. In that email, Day complained that Battle told him "we need to hire a handicap minority for production manager. It will satisfy all the diversity requirements." The district court found:

> ... Battle was in charge of Defendant's Jackson, Tennessee facility, the purpose and content of his statement was that he did not want to post a position because he did not want another African American employee to be hired, [but] the temporal connection between Battle's comment and Childs's promotion is unclear, since Day's testimony on when the comment was made is inconsistent. Battle's comment, while offensive, was isolated

and does not buttress other evidence of pretext.

(R. 96 at 38, PAGEID 4481; internal citations and quotations omitted). The court also found it unreasonable to infer "... that Battle mentioned his opposition to hiring a minority candidate at the March 2012 meeting since the attendees recommended that Stevie Thomas, an African American, be promoted to Cell Leader of the shipping department." (*Id.* at 38–39) There was no evidence about how and when the production supervisor job that Battle and Day discussed was actually filled. The court noted Edna Terry's 2013 EEOC claim, alleging that a Caucasian male was chosen for a supervisor position instead of her. But the court discounted her claim because there were no other facts in the record about that decision, or who may have been involved in choosing the Caucasian male. The court ultimately concluded that Battle's comments were isolated and ambiguous, and not probative of the decision to promote Childs.

The district court also considered Smith's EEOC charge, in which he claimed that he asked Weaks for time off to deal with a family issue, and Weaks said it was "not my problem." Weaks allegedly gave Smith an incorrect parts list, causing a shipping error for which Smith was blamed and reprimanded. The court found that Smith's conclusory allegations were not examples of discrimination or racial animus that might be probative of Weaks's reasons for promoting Childs. The court ultimately concluded that Artis had not established a genuine factual dispute on whether FB's reasons for promoting Childs were pretextual.

The district court then addressed Artis's hostile work environment claim, which was not included in his EEOC charge but was alleged under analogous state law. To support this claim, Artis cited a series of incidents involving Childs: Childs once said that "[p]eople need to do their damn job" but Artis was unsure if she directed the comment at him or at anyone in particular. Two employees told Artis that Childs called him a "Facebook Christian" and a "Biblethumper," but he never heard Childs say those things directly to him. When Artis and Childs had a verbal altercation during a meeting, she put her thumb very close to his face. Childs once complained that Artis was gone from his work station for over 30 minutes, when he had just taken a bathroom break. (This incident led to the meeting between Childs, Artis, Kurtz and Weaks, when Artis and Childs aired their frustrations and apologized to each other.) The court found that none of these incidents constituted direct or circumstantial evidence of racial animus or harassment.

Artis cited another group of incidents which he argued reflected an atmosphere of severe or pervasive racial harassment. The court noted that it must consider the totality of the circumstances and not whether each separate incident alone would be sufficient. This analysis includes both an objective and subjective component: would a reasonable person find the work environment hostile or abusive, and did the plaintiff subjectively believe it to be so. The incidents Artis cited included: Artis was helping Kay Meadows one day in the shipping department, and Battle said to him "You're done here. Your job is done here." (R. 58–1, Artis Dep. at 268, PAGEID 632) Artis thought the comment was hostile, suggesting he was "done" working at FB. Artis also claimed that African American employees are monitored more closely than Caucasian employees when using the restroom. A rubber chicken was seen hanging from a rope in a window of a building under construction, over a year before Childs was promoted.

It was removed and apparently not seen again. Sometime in the past, Artis saw a cartoon drawing hanging in the men's room, depicting a KKK member and an African–American man hugging, with a caption written below, "What is the south coming to?" The cartoon was removed and not seen again. A co-worker named Selph once gave him two books that Artis believed were offensive to African–Americans. Once when a printer did not timely arrive at the plant, Childs commented "I can get it here faster with a boatload of Chinese children." Childs once mentioned Ethiopia when she overheard Artis say something about airline pilots' low salaries, but she did not say anything about Ethiopia being poor or black. Artis claimed that the phrase "you people" was used by unidentified FB employees to refer to African American employees, and that there was generalized mistreatment of African American employees. Artis described offensive graffiti, KKK writings and a swastika, seen on the toilet paper dispenser in the mens' restroom. He first saw the graffiti several years ago, and said the writing "has always been there...." (R. 58–1, Artis Dep. at 196–197, PAGEID 560–561)

The district court found that the incidents collectively did not amount to severe or pervasive harassment. The rubber chicken/noose display was offensive, but it was removed and apparently not seen again. Childs's comments and Selph's act of giving him books were isolated incidents. All of the incidents Artis described occurred sporadically over a period of years, and he lacked personal knowledge about some of the incidents described by his co-workers. The court also noted that none of the incidents involved conduct that was physically threatening or humiliating, and concluded that FB was entitled to judgment on the claim.

Finally, the district court held that Artis's state law retaliation claim lacked merit, because he had not been subjected to a materially adverse employment action. Artis is not appealing the judgment with respect to this claim, and we need not discuss it further.

*Standard of Review*

We review de novo the district court's summary judgment. *Sullivan v. Oregon Ford, Inc.*, 559 F.3d 594, 594 (6th Cir. 2009). The moving party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). We consider the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir.2009).

*Failure to Promote.*

FB contends that it promoted Childs because she was the highest producing assembler in the department, had better assembler skills than Artis, and had longer tenure in the department. The job description states that cell leaders are required to direct, supervise, mentor, schedule or delegate to employees within their location, and are required to report attendance issues or excessive absences. Requirements of the successful candidate include:

—excellent communications and human relations skills with employees and co-workers;

—good technical and mechanical comprehension of the functions of products, tooling and work methods;

—must be decisive and have the ability to react to problems, which arise on an ongoing basis; and

—must have good reading, writing and mathematical skills.

(R. 68–1, PAGEID 3001)

Both Weaks and Day rated Artis higher than Childs on education. Weaks rated Childs higher than Artis on experience and decision-making, while Day gave them equal ratings in both areas. Day rated Artis higher on leadership while Weaks rated them equally, and both rated Artis higher on inter-personal skills. Kurtz and Weaks both testified that Childs has problems with "people skills," and she was counseled on several occasions about her temper. Artis insists that he was far more experienced than Childs, because he had been with the company five years longer and because his assembler job was more complex than Childs's prior position. Artis also criticizes the district court's reliance on what he asserts were "sham" performance evaluations that Weaks completed on March 14, 2012. Artis contends that the decision to promote Childs was made on March 1, in the closed-door meeting between Battle, Weaks and Quick, and that the evaluations were performed to provide cover for that discriminatory decision. Artis accuses FB of ignoring Day's interview scores, suggesting that discrimination is the only reason it would do so. And he contends that the district court failed to give appropriate credit to his longer tenure with the company, Day's opinion that Artis was more experienced, and a co-worker's opinion that Artis was a better employee.

In order to show that he was "plainly" more qualified than Childs, Artis must objectively demonstrate his superior qualifications. In *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806 (6th Cir.2011), Provenzano applied for an assistant manager's position for which the qualifications included a high school diploma, with a college degree a plus. Provenzano completed high school and had an associate's degree, but the chosen candidate lacked a high school diploma. We found that difference was not decisive because the job description listed forty areas of knowledge, skills and abilities, and did not state that any of them were mandatory. Provenzano had filled in at other stores, had performed some assistant manager duties, and had more experience and education. But the chosen candidate had a stronger performance record, and had no record of discipline or performance warnings while Provenzano had several. Given their relative strengths and weaknesses, we held that the evidence failed to show that Provenzano was the plainly superior candidate of the two.

■ We find that to be the case here. FB concedes that Childs and Artis were both qualified for the position. Their overall evaluation scores and on the interview matrices were very close, with Artis receiving better scores in areas of interpersonal skills while Childs scored higher in technical competency. Artis disputes the scores but his dispute is largely premised on his own opinion about his job performance, and the opinions of two co-workers, Day and Marcus Tyus. Day testified that he was regularly on the plant floor and observed employees working. But Day did not work in the pump area, and there is no evidence that he had any experience or training in the job duties required of assemblers or of cell leaders. Tyus did not work in Department 2195 when Childs was promoted; he became an assembler in that department a short time later, so he lacked personal knowledge of the relative skills and knowledge of the two candidates at the time of the promotion. Tyus believed that Artis was highly qualified for the position "... because he's approachable.... I feel like he's more of a people person." Tyus testified that Childs is a good worker

but that "... some days she can just be very difficult, you know, not approachable ... Usually we can pick up on it, you know, first thing in the morning, so we know what we've got to do...." (R. 69–1, Tyus Dep. at 25–26, PAGEID 3122–3123) Tyus's opinion of Childs's "people skills" is apparently shared by Weaks and Kurtz. Those opinions do not trump the rest of Weaks's evaluation of the qualifications of the two candidates. It is also worth noting that Artis gave himself an overall score of 3.5 on his self-evaluation form, the same score he received from Weaks.

We also reject Artis's contention that the district court misunderstood the March 14 evaluations when describing them as the "2011" evaluations. (See R. 96 at 15 and n.3.) Childs testified that evaluations were performed once a year on all employees, usually in the spring. (R. 69, Childs Dep. at 15, PAGEID 3017) Artis received a raise on April 12, 2011 (R. 61–1, PAGEID 1136), presumably in conjunction with a review. His 2012 evaluation was signed on March 13, 2013, and his raise was effective on March 26, 2013. (R. 61–1, PAGEID 1151 and 1156; and see R. 48, FB's SUMF ¶ 60, and Artis's response, R.57 at 60, PAGEID 363.) While the March 14, 2012 evaluation does not state that it covers calendar year 2011, there is a lack of evidence raising a reasonable inference that the evaluation was anything other than a regular yearly evaluation, much less a subterfuge to disguise a discriminatory promotion decision. We agree with the district court's conclusion that Artis was not the "plainly superior" candidate.

Artis alternatively argues that he and Childs were both qualified, and he presented sufficient other evidence to establish a triable issue on pretext. He outlines the other evidence that he contends the district court improperly ignored or discounted:

Battle told Day that Childs would be promoted to cell leader before the job was even posted. Artis contends that Battle and Weaks knew that Artis wanted a promotion, and that Edna Terry was interested in the production supervisor position. Artis also cites Weaks's admission that Childs's "people skills" needed improvement, yet Weaks gave her a score of 4 out of 5 on her evaluation in areas of expressing her views, being sensitive to feelings of others, and maintaining a professional attitude. (R. 67–3 at PAGEID 2995) Weaks gave Artis the same score in this category, even though Weaks believed that Artis was a "role model" for his subordinates. Day testified that Battle and Weaks were "pretty adamant" about choosing Childs and Meadows. (R. 63–1, PAGEID 1674) In a series of early April 2012 emails, Day informed Schultz that Battle wanted to leave the production supervisor position vacant because Kay Meadows decided not to apply for it, and Battle knew that Edna Terry, an African American employee, wanted that job. Day also told Schultz that Battle wanted to increase the salary to entice Meadows to accept it, even if it went beyond the regular pay range for the position, because Battle did not want any other candidate (e.g., Edna Terry). On April 3, Day emailed Schultz saying that during the March 1 meeting, "it was already concluded that Sherry Childs would get the Pumps Cell Leader and Kay Meadows to get the Distribution Supervisor position. No other employee had an opportunity from the beginning." (R. 66–1, at PAGEID 2778–2784, is the series of emails between Day and Schultz.) Weaks recalled the March 1 meeting being more like a "brain-storming meeting" to discuss what would happen if certain individuals were moved from one position to another; during that discussion "some names came up, like if this person was willing to do this or who else or ... how would it affect

everybody in the organization?" (R. 61, Weaks Dep. at 138, PAGEID 1108) Weaks could not remember who first mentioned Childs for the cell leader position, but he conceded that it might have been Battle. (*Id.* at 142, PAGEID 1112)

Artis also cites Day's testimony about the incidents involving Bob Battle and his discriminatory, racist comments. We have noted that such "discriminatory atmosphere" evidence can give rise to an inference that a particular decision was made for discriminatory reasons. The probative value of such evidence is determined by several factors, including who made the comment, what was said, and the temporal proximity of the comment to the challenged decision. *Griffin*, 689 F.3d at 595. The district court discounted most of the incidents involving Battle as either remote and isolated, or irrelevant because Battle was not the "ultimate" decisionmaker. But we believe that Battle's management position, coupled with Weaks's concessions that Battle may have mentioned Childs for promotion during the March 1 meeting, and that he would get Battle's "blessing" before finalizing any decision, make Battle's comments and attitudes relevant to the question of pretext. They include:

(1) Day testified that sometime in 2011, either at the plant or at a business dinner, Battle called him a "halfbreed." Day recalled that Battle asked him about his race, and Day said "some of my ancestors was white and black. And then [Battle] made the statement that, you're a halfbreed." (R. 63, Day Dep. at PAGEID 1499)

(2) Once during a conversation, Battle told Day that he had previously lived in New York, and "talked about some gays going into a bar," suggesting Battle did not like gays. (R. 63, Day Dep. at PAGEID 1490) Day concluded that Battle feels uncomfortable around homosexuals and racial minorities.

(3) Battle called an African–American co-worker a "Mexican" and stereotyped her. (R. 62–1, Day Dep. at PAGEID 1355–1356) Battle admitted to Schultz during a subsequent investigation that he had called the employee a Mexican. In another meeting, Battle said something to Day about "only blacks like going to jazz concerts." (*Id.* at PAGEID 1358)

(4) Battle did not want blacks or females in management positions, and said that "blacks had to be trained longer.:" This comment was during a conversation about a specific African–American applicant, whom Battle said "would have had to be trained for two years to be ready to go into operation management" while a white female applicant would be ready in six months. This did not make sense to Day. Day then said that he would not be surprised if Battle favored hiring the black applicant, because Battle "thought he could manipulate the black guy more" than the white female who was actually hired. (R. 63, Day Dep. at PAGEID 1537–1539)

(5) In March 2011, Day and Battle discussed a production manager position. Day said the position should be posted before being filled and Battle responded that "we need to hire a handicap minority for production manager. It will satisfy all the diversity requirements." (R. 65, Day Dep. Ex. P, at PAGEID 2207) Day complained to Betty Schultz about Battle's comment and a number of other disputes with Battle a few days later.

(6) In July 2011, Day filed an internal complaint about Battle with Schultz, reciting a number of incidents. Schultz visited the plant in July 2011 to investigate, and wrote a summary of her interview with Battle. (R. 72 at PAGEID 3423–3425) Battle was required to attend sensitivity and diversity training, and Day began re-

porting directly to Schultz. Artis contends that Finishing Brands failed to require Battle to complete this training.

(7) Battle told Day that he "didn't want to hire a black" for a position, referring to Edna Terry's interest in the production supervisor position. The district court discounted this comment because it was not clear when it was made. But Day described two specific comments—Battle saying he should hire a "handicap minority" to fulfill EEOC requirements and that he "didn't want to hire a black"—both of which are objectionable and relate directly to hiring practices. We believe that the precise timing of these comments (whether one was made a year before or contemporaneously with Childs's promotion) is secondary to the import of Battle's comments, which a jury could conclude reflect the discriminatory attitude of the top plant manager who was regularly involved in hiring and promotional decisions.

Edna Terry's EEOC claim (which the district court discounted) also lends support to Day's testimony that Battle did not want African–Americans in management positions, and removed job listings when an African–American candidate expressed interest in the job. Terry's June 17, 2013 EEOC claim alleged: "It is the practice of [Finishing Brands] to withdraw posted positions if African Americans apply for those positions. Charging Party was granted no interview and was given no explanation when the position was awarded to a Caucasian male in March 2013...." (R. 71–2, at PAGEID 3417–3418)

This collection of incidents must be considered along with the totality of the evidence Artis presents concerning the March 1 meeting and its aftermath. We addressed the probative value of discriminatory statements by individuals in positions of corporate authority in *Ercegovich v.*

*Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir.1998), where the vice president of plaintiff's sales division complained that the "company is being run by white haired old men waiting to retire, and this has to change." The VP also told a personnel manager that "he did not want any employee over 50 years old on his staff." The district court found those remarks irrelevant because the VP was not the ultimate decisionmaker regarding the elimination of plaintiff's position. We reversed, finding that the remarks supported a reasonable inference that discrimination entered into that decision. The remarks were relevant because (1) the decision maker admitted that the VP was "involved" in discussions about the elimination of plaintiff's job; (2) the VP was in the position to "shape the attitudes, policies, and decisions" of his managers; and (3) the remarks were neither ambiguous nor abstract, and directly referred to older workers. *Id.* at 354–356.

▮ Here, the evidence shows that Battle was clearly "involved" in discussions about filling the cell leader position. As plant manager, Battle was in a position to affect the attitudes and decisions of his subordinate managers. Battle's remarks are not ambiguous nor abstract: they are clearly offensive and directly refer to the employment of African–Americans and minorities. We therefore conclude that the district court erred in granting judgment to FB under the second prong of Artis's failure to promote claim. We find that the evidence, viewed in the light most favorable to Artis, gives rise to a reasonable inference that racial discrimination may have motivated the decision to promote Childs instead of Artis.

*Hostile Work Environment*

Artis also appeals the district court's adverse judgment on his hostile work environment claim. To satisfy his prima facie

burden, Artis must demonstrate: 1) he is a member of a protected class; 2) he was subjected to unwelcome racial harassment; 3) the harassment was based on race; 4) the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and 5) FB is liable for the harassment. *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir.1999). A "hostile or offensive" environment is one that is "... permeated with discriminatory intimidation, ridicule or insult sufficiently severe or pervasive to alter the conditions of employment." *Waldo v. Consumers Energy Co.,* 726 F.3d 802, 813 (6th Cir.2013)(internal citations and quotations omitted). In determining whether a hostile environment exists, the court must consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Artis contends that the district court erred by separately examining each incident he cites, rather than considering them collectively. He relies on most of the same incidents discussed above, including the incident involving a co-worker who gave him two books he found to be offensive, and suggesting that this co-worker was "known" for his racist remarks. But Artis does not cite any such remarks attributed to this individual. He also relies on Battle's racist comments to Day; the graffiti in the bathroom; Battle telling Artis that his "job is done here;" the friction between Artis and Childs; and unidentified co-workers calling African–Americans "you people." Artis contends the district court ignored the covert nature of racism and discrimination, and the effects of the severe and pervasive hostile environment at the plant. He particularly relies on the rubber chicken/noose incident, which Artis argues is a potent symbol of racist repression.

Artis cites *Austion v. City of Clarksville,* 244 Fed.Appx. 639 (6th Cir.2007), which was an appeal from a jury verdict in favor of an African American police officer on his hostile work environment claim. In that case, a noose was found hanging in a city police station and was left there for four months, until an African American officer contacted the NAACP, who in turn contacted the police department and asked that it be removed. There was evidence adduced at trial about a plethora of other racially tinged incidents. A superior officer called African–American officers who filed EEOC charges "complainers" and "disgruntled employees," and the police chief yelled at plaintiff after he complained of discrimination, calling him disloyal and disrupting. A drive-by shooting occurred at an officer's house that was suspected to be caused by racial tension in the department. There was frequent use of racist epithets (including the word "nigger") to describe African American officers. And plaintiff testified that the stress of his working environment left him feeling defensive, depressed, and so paranoid that he always carried a gun and a tape recorder. We found this body of evidence sufficient to support the jury's verdict. The evidence Artis cites here pales in comparison to that described in *Austion.*

■ We conclude that the district court properly found that the record evidence does not demonstrate the existence of an objectively hostile work environment. Childs made a few comments that Artis believes were racist; Selph gave him two books which apparently offended him; the noose was removed and never seen again.

Bathroom graffiti may well be offensive, but it does not create an objectively intolerable workplace. While we agree that Battle's comments were offensive and discriminatory, they were not made directly to Artis. Considering all of the incidents collectively, we agree with the district court's conclusion that the incidents did not create an atmosphere of actionable severe or pervasive harassment.

In sum, we affirm the district court's judgment with respect to the hostile environment claim and its conclusion that Artis was not plainly more qualified than Childs for promotion to cell leader. We reverse the district court on the issue of pretext, and conclude that Artis has established a genuine dispute that FB's choice to promote Childs was motivated by racial discrimination.